# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **PATTY A. HAMILTON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00037 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Patty A. Hamilton, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq*. (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance."
*Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hamilton filed her applications for DIB and SSI on October 20, 2005,[1] alleging disability as of January 1, 2003, due to congestive heart failure, diabetes, hypertension, glaucoma, arthritis, depression, anxiety and social phobia. (Record, ("R."), at 14, 104, 114.) The claims were denied initially on July 7, 2006. (R. at 57-66.) However, Hamilton requested reconsideration due to worsening mental symptoms and pain. (R. at 51, 104, 126.) Based upon a consultative psychological evaluation, performed by B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on January 2, 2007, as well as other updated treatment records, the state agency found Hamilton disabled as of February 1, 2006,[2] but not prior thereto. (R. at 45.) Hamilton then requested a hearing before an administrative law judge, ("ALJ"), asserting that she became disabled as of January 1, 2003. (R. at 44, 408.) The ALJ held a hearing on June 28, 2007, at which Hamilton was represented by counsel. (R. at 406-46.)

By decision dated October 25, 2007, the ALJ denied Hamilton's claims. (R. at 14-26.) The ALJ found that Hamilton met the nondisability insured status

---

[1]Hamilton's applications are not contained in the record on appeal.

[2]Hamilton was found disabled as of February 1, 2006, under the Medical-Vocational Guidelines, ("the Grids"), found at 20 C.F.R. Part 404, Subpart P, Appendix 2, based on her residual functional capacity, education, past work experience and having attained the age of 50.

requirements of the Act for DIB purposes through the relevant period in question.[3] (R. at 16.) The ALJ also found that Hamilton had not engaged in substantial gainful activity during the relevant period in question. (R. at 16.) The ALJ determined that the medical evidence established that Hamilton suffered from severe impairments, namely depression, diabetes mellitus, coronary artery disease and foot neuropathy, but she found that Hamilton did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 during the relevant time period. (R. at 17-19.) The ALJ found that, during the relevant time period, Hamilton had the residual functional capacity to perform light work[4] limited by an occasional ability to perform postural activities, an inability to deal with the public and an inability to perform more than simple, noncomplex tasks. (R. at 19-23.) The ALJ found that Hamilton was unable to perform any of her past relevant work during the relevant time period. (R. at 24.) Based on Hamilton's age,[5] education, work history and residual functional capacity during the relevant time period and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Hamilton could perform during the relevant time period, including jobs as a hand packer, a sorter and a small parts assembler. (R. at 24-25.) Thus, the ALJ found that Hamilton was not under a disability as defined under the Act and was not eligible for benefits during the relevant time period. (R. at

---

[3]The ALJ defined the relevant time period as January 1, 2003, Hamilton's alleged onset date, through January 31, 2006, the day prior to the date that the state agency found her to be disabled under the Grids. (R. at 15.) All references in this Report and Recommendation to "the relevant time period" reference that same time.

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

[5]During the relevant time period, Hamilton was 46 to 49 years old.

26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

After the ALJ issued her decision, Hamilton pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 6-9.) Hamilton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). The case is before this court on Hamilton's motion for summary judgment filed November 13, 2009, and the Commissioner's motion for summary judgment filed December 11, 2009.

## II. Facts[6]

Hamilton was born in 1956, (R. at 110, 122), which, at the time relevant to the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Hamilton has a high school education and past relevant work experience as a cashier. (R. at 115, 119-20, 156.) Hamilton testified that prior to 2006, she received mental health treatment at Stone Mountain Health Services for a few months before being referred to Bon Secours, where she received monthly counseling for approximately six to eight months before it closed. (R. at 413-14.) Hamilton testified that she was not referred to another mental health services provider at that time because she had lost her Medicaid benefits in July 2004 when her daughter turned 19. (R. at 415.) Hamilton testified that in 2005 she attempted to return to work as a cashier at a convenience store because she was "losing [her] home, [her] car, everything else." (R. at 415.) However, she stated that she quit working after only one month when she

_____

[6]Medical evidence dated outside of the relevant time period is included in this Report and Recommendation only if pertinent to the question of disability during the relevant time period or for clarity.

suffered a heart attack and was informed that she needed surgery. (R. at 415-16.) Hamilton testified that she had worked previously at the same job, but had to quit in 2001 due to a "nervous breakdown," which she described as increased fear of going out in public. (R. at 416-17.) Hamilton testified that, following this breakdown, she was prescribed Prozac and Paxil, which did not help her condition. (R. at 418, 420.) She further stated that she did not attempt to return to work after receiving psychotropic medication. (R. at 418.) Hamilton also testified that she stopped taking her anxiety medication when she lost her insurance in 2004 and had not sought medication from free clinics or drug programs because she did not want to get out in public. (R. at 418-19.) She stated that she began taking Wellbutrin, Effexor and Vistaril in April 2007. (R. at 418, 421.)

Hamilton moved to Baltimore, Maryland, in October 2004 to live with her cousin, but she testified that she did not look for work there because she "couldn't face going outside." (R. at 423.) She also stated that she did not receive psychiatric treatment in Baltimore. (R. at 423-24.) Hamilton testified that she returned to Virginia in April 2005, and after suffering a heart attack in September 2005, she moved in with her elderly mother. (R. at 425, 427.) She stated that she tried to help her mother with housework, but did not attend church with her mother and did not grocery shop because she did not want to be in public. (R. at 426-27.)

Hamilton testified that while again in Baltimore in 2005, she began using crack cocaine on a daily basis and used heroin intravenously three or four times. (R. at 432.) She stated that she was hospitalized in a psychiatric unit while in Baltimore for one week after experiencing drug-induced suicidal tendencies. (R. at 434.) After being

discharged, Hamilton testified that she once again returned to Virginia and had not used any illegal drugs or had any suicidal thoughts since that time. (R. at 434, 440.) Hamilton testified that she could not work following the heart attack in September 2005 due to her fears of being in public. (R. at 437.) She stated that since approximately 2001, she wanted to stay in bed three to four days weekly, and that prior to quitting work, she was absent a lot because she could not face going out. (R. at 439.) Hamilton testified that she had seen a psychiatrist three weeks prior to the hearing and had received medication, but had not been referred for counseling. (R. at 428.)

Norman E. Hankins, a vocational expert, also was present and testified at Hamilton's hearing. (R. at 440-44.) Hankins classified Hamilton's past relevant work as a cashier as light and semiskilled, and he testified that she had transferable skills to sedentary work.[7] (R. at 441-42.) Hankins testified that an individual who had difficulty dealing with the public could not work as a cashier. (R. at 442.) Hankins was asked to consider a hypothetical individual of Hamilton's age, education and work background during the relevant time period, who could perform light work limited by an occasional ability to climb, balance, kneel, crouch, crawl and stoop, a moderate reduction in concentration requiring the performance of no more than simple, noncomplex tasks and an inability to work with the public. (R. at 442.) Hankins testified that such an individual could perform jobs existing in significant

---

[7]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

numbers in the national economy, including those of a hand packer, a sorter and a small parts assembler. (R. at 442-43.) When Hankins was asked to consider the same individual, but who could not get out of bed on a weekly basis, he testified that such an individual could not perform any jobs. (R. at 444.)

In rendering her decision, the ALJ reviewed records from Mountain View Regional Medical Center; Paul A. Lee, P.A., physician's assistant; Cardiovascular Associates; Dr. Kevin Blackwell, D.O.; Dr. Richard M. Surrusco, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; Stone Mountain Health Services; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Bon Secours Baltimore Health System; Dr. Uzma Ehtesham, M.D., a psychiatrist; and Dr. Khalid J. Awan, M.D., an opthalmologist.

From July 3, 2000, to July 22, 2002, Hamilton saw Dr. Mark O'Brien, M.D., at Stone Mountain Health Services, ("Stone Mountain"). (R. at 308-30.) Over this time, Hamilton complained of hypertension, depression and anxiety. (R. at 309, 311-12, 316-17, 319, 330.) Specifically, Hamilton reported feeling depressed and experiencing crying spells and panic attacks. (R. at 311, 316-17, 319.) On January 24, 2002, Hamilton informed Dr. O'Brien that she had quit her job after her supervisor made her work at different locations, which was "much harder on her emotions." (R. at 319.) Nonetheless, she stated that she was not up to looking for a new job. (R. at 319.) Dr. O'Brien diagnosed uncontrolled hypertension, anxiety disorder and depression. (R. at 308, 312, 314, 316-17, 319, 330.) He advised Hamilton that her depression could improve with treatment. (R. at 319.) He treated Hamilton conservatively with medications, including Zestril, Zestoretic, Prinzide, Prozac,

Celexa and Paxil. (R. at 308, 312, 314, 317, 319, 321, 324, 330.) Dr. O'Brien also advised Hamilton to diet, exercise, stop smoking and socialize, and he referred her to mental health counseling. (R. at 314, 317, 319, 324, 330.) On April 15, 2002, despite continued complaints of depression, Hamilton reported no interest in mental health counseling and informed Dr. O'Brien that she kept her appointment because, otherwise, her family intended to have her involuntarily committed. (R. at 316.) On that day, Hamilton also saw Crystal Burke, a licensed clinical social worker. (R. at 316.) Burke described Hamilton as guarded and uncooperative, and Hamilton again refused counseling. (R. at 316.) Later that month, Hamilton reported a fear of leaving the house and talking with people, noting that she sometimes hid when people came to her house. (R. at 314.) Hamilton began seeing Burke for mental health counseling at that time. (R. at 314.) The treatment notes from this time period show some improvement in both her physical and mental conditions with medication. (R. at 309, 311-12, 317, 321, 330.) The record does not contain any evidence showing that Burke placed any restriction on Hamilton's work-related activities.

Hamilton saw Dr. Candace Bellamy, M.D., at Stone Mountain, from September 25, 2002, through December 1, 2003, with the same complaints as above, in addition to elevated blood glucose levels and bilateral knee pain. (R. at 286-306.) On September 25, 2002, Hamilton reported continued depression and isolation. (R. at 306.) Despite claiming medication compliance, her blood pressure was 152/100. (R. at 306.) Dr. Bellamy diagnosed depression, increased her dosage of Paxil, prescribed Remeron and Cardizem and encouraged continued counseling. (R. at 306.) On November 6, 2002, Hamilton reported being gone to Maryland for a month, during which time her prescriptions had gotten messed up. (R. at 303.) She stated that she

had been out of her Zestoretic for two and a half weeks.  (R. at 303.)  She further described continued difficulty meeting people and concentrating.  (R. at 305.)  Her blood pressure was 180/110.  (R. at 303.) Dr. Bellamy diagnosed uncontrolled hypertension and depression.  (R. at 303.)  She was given a trial of Zelnorm, and her dosage of Cardizem was increased.  (R. at 303.)  On November 11, 2002, Hamilton reported that Paxil had only a minimal impact on her depressive symptoms.  (R. at 305.)  She continued to isolate herself and reported wishing that she was dead.  (R. at 305.)  Hamilton's mood was depressed.  (R. at 305.)  On November 19, 2002, she reported a month-long history of abdominal pain, dry mouth and increased thirst.  (R. at 301.)  She reported that her blood sugar level that morning was 474, and fingerstick glucose testing revealed a blood sugar level of 585.  (R. at 301.)  Dr. Bellamy referred Hamilton to Norton Community Hospital for further evaluation.  (R. at 301.)

On November 26, 2002, Hamilton reported having been hospitalized for four days due to increased blood sugar levels.  (R. at 299.)  She also reported that Paxil was not helping, stating that she had contemplated suicide over the previous couple of weeks.  (R. at 299.)  Hamilton also complained of right knee pain, especially with extension.  (R. at 299.)  Dr. Bellamy diagnosed type 2 diabetes, new onset, depression and knee crepitus.  (R. at 299.)  She referred Hamilton to see a psychiatrist, and she prescribed Lexapro and Ambien.  (R. at 299.)  On December 2, 2002, Hamilton's blood sugar level was improved at 129.  (R. at 297.)  She complained of aching in both knees.  (R. at 297.)  Hamilton's diabetes was improving with Glucophage.  (R. at 297.)  Dr. Bellamy ordered a bilateral knee x-ray, which was performed on December 10, 2002, and which showed only mild degenerative changes in both knees.  (R. at 296-97.)

On February 3, 2003, Hamilton again reported not getting out much. (R. at 294.) She stated that she had run out of her medications, but did not get refills. (R. at 294.) Although Hamilton complained of depression, she did not keep an appointment with a psychiatrist, explaining that she felt nauseated and sick before an appointment, which prevented her from going. (R. at 294.) After discussing the need to abide by recommended treatment, Hamilton agreed to keep her next appointment with the psychiatrist and resume her medications as prescribed. (R. at 294.) Hamilton denied suicidal or homicidal ideations. (R. at 294.) Dr. Bellamy informed Hamilton that if she did not make an effort to keep her appointments, she could not complete the work status form as requested by Hamilton. (R. at 294.) Her hypertension was stable at that time. (R. at 294.) On May 7, 2003, Dr. Bellamy noted that Hamilton was noncompliant with her diabetes medications, in that she had designed her own treatment regimen. (R. at 292.) Hamilton continued to complain of bilateral knee pain despite the negative x-ray findings. (R. at 292.) Dr. Bellamy diagnosed type 2 diabetes, hypertension, hyperlipidemia, gastroesophageal reflux disease, ("GERD"), and depression. (R. at 292.) She agreed to complete Hamilton's TANF form once more until she could see the psychiatrist at the end of the month. (R. at 292.)[8] Dr. Bellamy noted that Hamilton's blood sugar levels needed to be under better control, and she referred her for further evaluation of her knee pain. (R. at 292.) On August 6, 2003, Hamilton's blood sugar levels were much improved, and her blood pressure was 118/72. (R. at 289.) She had an improved affect, and she reported doing better since seeing the psychiatrist. (R. at 289.) Dr. Bellamy diagnosed type 2 diabetes and depression, improved since seeing a psychiatrist and having her medication adjusted. (R. at 289.)

---

[8]This TANF form is not contained in the record before the court.

On December 1, 2003, Hamilton reported doing well, noting that she had lost five pounds since her last visit. (R. at 286.) Her blood pressure was stable, and the majority of her weekly blood sugar level readings had been below 150. (R. at 286.) Hamilton continued to smoke a pack of cigarettes a day with no interest in quitting. (R. at 286.) She reported that she continued to see the psychiatrist and was feeling a lot better, denying suicidal or homicidal ideations. (R. at 286.) Hamilton's blood pressure was 120/74. (R. at 286.)

Hamilton was admitted to the psychiatric unit at Bon Secours Baltimore Health System, ("Bon Secours"), on March 19, 2004, due to suicidal tendencies with a plan to cut her wrists. (R. at 380-87.) She reported having begun to use crack cocaine approximately one month prior to this admission, and within the week prior to the admission, she had begun using heroin intravenously. (R. at 380.) A toxicology screen was positive for cocaine and opiates. (R. at 383.) Hamilton also was noncompliant with her medications, reporting not taking her Prozac for six weeks prior to the admission because she could not afford it and she did not think she needed it. (R. at 381.) Upon admission, Hamilton was fully oriented and cooperative with a depressed mood and affect. (R. at 381.) She reported intermittent suicidal thoughts. (R. at 381.) Her memory was variable, and judgment and insight were limited. (R. at 381.) Dr. Harini Balu, M.D., a psychiatrist, placed Hamilton on Prozac and Trazodone. (R. at 382.) Dr. Leroy C. Bell Jr., M.D., noted that Hamilton had a considerable amount of situational stressors, including being homeless, without funds and undergoing withdrawal from both the recreational use of heroin and cocaine along with limited amounts of alcohol. (R. at 384.) Upon admission, Hamilton was diagnosed with major depression and polysubstance abuse, and her Global Assessment

of Functioning, ("GAF"), score was assessed at 37.[9]  (R. at 385, 387.)  Hamilton's mood and affect stabilized over the course of this hospitalization.  (R. at 382.)  She stated her intention to return to Virginia to live with her mother.  (R. at 382.)  Upon discharge on March 28, 2004, Hamilton's behavior was appropriate, she did not have suicidal ideations and she was future-oriented.  (R. at 382.)  She was diagnosed with major depressive disorder, recurrent, severe, with no psychotic features and polysubstance abuse, and her GAF score again was assessed at 37.  (R. at 380.)  Hamilton was discharged to follow up in Virginia, and she was given a 24-hour crisis center hotline number.  (R. at 380.)

Hamilton returned to Stone Mountain on May 3, 2004.  (R. at 283.)  She reported her hospitalization in Baltimore for suicidal ideations, but stated that she did not fill the prescription given to her upon discharge because she could not afford it.  (R. at 283.)  However, she reported no suicidal or homicidal ideations since being back home.  (R. at 283.)  She reported not taking any of her medications for two months due to financial difficulty.  (R. at 283.)  Nonetheless, Hamilton stated that she felt a lot better since returning home.  (R. at 283.)  She also complained of pain due to arthritis and requested Vioxx, and she reported some chest pain and shortness of breath for the previous week.  (R. at 283.)  Dr. Bellamy prescribed Prozac and Doxepin and referred Hamilton to Life Recovery.  (R. at 284.)  On September 16, 2004, Hamilton requested medication refills.  (R. at 280.)  She denied chest pain or

_____

[9]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. . . ."  DSM-IV at 32.

shortness of breath. (R. at 280.) She continued to smoke a pack of cigarettes each day with no interest in quitting. (R. at 280.) Hamilton reported blood sugar levels at home averaging 120. (R. at 280.) She denied suicidal or homicidal ideations, and she stated that she was keeping busy driving her son to his new job. (R. at 280.) Dr. Bellamy diagnosed diabetes mellitus type 2, hyperlipidemia and depression. (R. at 280.) Hamilton was again encouraged to quit smoking. (R. at 280.)

Hamilton was admitted to Mountain View Regional Medical Center on September 23, 2005, with complaints of shortness of breath, abdominal pain and chest tightness with associated weakness and sweating. (R. at 181.) She reported taking no medications at that time. (R. at 181.) She also noted that she was working as a cashier. (R. at 181.) Hamilton was diagnosed with congestive heart failure and coronary artery disease with ischemia, among other things. (R. at 177.) On September 30, 2005, Hamilton was transported to Holston Valley Hospital and Medical Center for cardiac catheterization and further assessment. (R. at 177.) Following catheterization, Dr. Gregory Miller, M.D., diagnosed coronary artery disease and non ST elevation myocardial infarction, among other things. (R. at 203.) Bypass surgery was recommended. (R. at 203-04.)

On December 14, 2005, Hamilton complained of elevated blood sugar levels. (R. at 278.) She reported having been hospitalized with a heart attack and having been advised to get her blood sugar levels under control before undergoing bypass surgery. (R. at 278.) She denied any chest pain, shortness of breath or edema. (R. at 278.) Her blood sugar level was 249. (R. at 278.) She was continued on medication. (R. at 278.) On December 21, 2005, Hamilton's weekly blood sugar levels ranged from 149 to

249.  (R. at 276.)  She reported medication compliance, as well as trying to diet and exercise.  (R. at 276.)  Hamilton denied chest pain and shortness of breath, and her blood sugar level at that time was 229.  (R. at 276.)  Her dosage of Glucophage was increased.  (R. at 276.)  On January 4, 2006, Hamilton's weekly blood sugar levels ranged from 104 to 188, and her blood pressure was 108/68.  (R. at 274.)  She stated that she was dieting, but not exercising.  (R. at 274.)

On January 10, 2006, Hamilton underwent a quadruple coronary artery bypass grafting procedure.  (R. at 211-12.)  She was discharged on January 14, 2006.  (R. at 208-09.)

Hamilton saw Dr. Kevin Blackwell, D.O., for a consultative examination on June 9, 2006.  (R. at 219-23.)  Hamilton reported smoking about four cigarettes per day.  (R. at 220.)  Her gait was symmetrical and balanced, but she was tender in the lumbar musculature.  (R. at 221.)  She also had tenderness with forward flexion at the waist, which reproduced chest tenderness.  (R. at 221.)  She had some limitation with bilateral shoulder abduction. (R. at 221.) There was no effusion or obvious deformities of the upper or lower extremities, which also were normal for size, shape, symmetry and strength. (R. at 221.) Grip strength was good, fine motor movement skills of the hands was normal, and reflexes were normal throughout.  (R. at 221.)  X-rays of both knees showed mild arthritic changes.   (R. at 225-26, 228-29.)   Dr. Blackwell diagnosed bilateral knee and hand pain, coronary artery disease, history of coronary artery bypass surgery and history of depression.  (R. at 221.)  Dr. Blackwell opined that Hamilton should not repetitively climb greater than two flights of stairs without rest and that she could maximally lift items weighing up to 30 pounds and frequently

lift items weighing up to 15 pounds. (R. at 222.) He found that she could stand for six hours in an eight-hour workday and sit for eight hours in an eight-hour workday with normal positional changes. (R. at 222.)

On June 20, 2006, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Hamilton could perform light work with an occasional ability to climb, to balance, to stoop, to kneel, to crouch and to crawl. (R. at 230-34.) He found Hamilton's allegations partially credible. (R. at 235.)

On June 30, 2006, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Hamilton had a nonsevere affective disorder, namely major depressive disorder. (R. at 236-48.) He opined that she was not restricted in her activities of daily living, had mild difficulties maintaining social functioning, no difficulty maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 246.) Tenison found Hamilton's allegations partially credible. (R. at 248.)

Dr. Blackwell performed another consultative examination on December 27, 2006. (R. at 333-36.) Hamilton reported that she continued to smoke cigarettes. (R. at 334.) On examination, Hamilton's blood pressure was 160/100. (R. at 335.) She exhibited some decreased sensation to fine touch and light touch in the lower extremities bilaterally. (R. at 335.) Her gait was symmetrical and balanced. (R. at 335.) Upper and lower extremity examination was unremarkable, and Hamilton's grip

strength was good.  (R. at 335.)  Dr. Blackwell diagnosed hypertension, history of bilateral neuropathy, history of coronary artery disease and history of anxiety/social phobias.  (R. at 336.)  Dr. Blackwell opined that Hamilton had no limitations related to the cardiovascular system, although she had asymptomatic elevated blood pressure. (R. at 336.)  He opined that Hamilton would be limited to squatting and kneeling less than a third of the day and bending and stooping less than two thirds of the day.  (R. at 336.)  He further opined that she could lift items weighing up to 30 pounds, but could frequently lift items weighing up to 20 pounds and that she could sit for eight hours in an eight-hour workday and stand for four hours in an eight-hour workday with normal positional changes.  (R. at 336.)  Dr. Blackwell noted that a functional capacity evaluation may better delineate objectively Hamilton's limitations.  (R. at 336.)

The same day, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a consultative psychological evaluation of Hamilton.  (R. at 337-43.) Hamilton reported that her anxiety and social phobias were "much worse."  (R. at 337.)  She was fully oriented.  (R. at 337.)  She informed Lanthorn that she had seen Christie Collins, a licensed clinical social worker, as well as two psychiatrists, including a Dr. White, for approximately one year, but stopped seeing them in 2003.[10] (R. at 339.)  However, she reported that they had diagnosed her with social phobia, agoraphobia and body dysphoric disorder.  (R. at 339.)

Hamilton reported psychological problems dating from childhood, stating that she felt like she did not fit in and did not want to be around people.  (R. at 339.)  Her

---

[10]No medical records from Collins or Dr. White were submitted to the court.

affect was "most decidedly blunt and flat," and she made erratic to poor eye contact. (R. at 339.) Lanthorn described her mood as severely depressed. (R. at 339.) Lanthorn opined that Hamilton was functioning in the low average range of intelligence. (R. at 340.) Hamilton reported socializing with family only, and she reported frequent crying and preferring to be alone. (R. at 340.) Hamilton stated that she experienced one to two panic attacks weekly, which lasted between 10 and 15 minutes and which were more prevalent outside of her home. (R. at 340-41.) She reported a generalized feeling of anxiety during which she felt like her "skin [was] melting." (R. at 340.) Hamilton described a typical day to include reading and watching television and helping her mother. (R. at 341.) She evidenced no signs of delusional thinking or ongoing psychotic processes, but was ill at ease with Lanthorn. (R. at 341.)

Lanthorn diagnosed major depressive disorder, recurrent, severe; panic disorder without agoraphobia; generalized anxiety disorder; and schizoid personality disorder, and he assessed her then-current GAF score at 40. (R. at 341-42.) Her prognosis was deemed comparatively poor. (R. at 342.) Lanthorn strongly encouraged Hamilton to seek psychiatric and psychotherapeutic intervention. (R. at 342.) He opined that her problems with depression and anxiety, as well as social withdrawal, had been "very long-standing" and that she was in dire need of treatment. (R. at 342.) He further opined that she was unable to perform a 40-hour per week job even with simple and repetitive tasks due to difficulties working well with co-workers, supervisors and the public. (R. at 342-43.)

Hamilton began seeing Dr. Uzma Ehtesham, M.D., a psychiatrist, on May 21,

2007.  (R. at 399-400.)  At that time, Hamilton reported that she felt sad and helpless, experienced mood swings and panic attacks and isolated herself.  (R. at 399.)  Dr. Ehtesham diagnosed major depressive disorder and generalized anxiety disorder and assessed Hamilton's then-current GAF score at 60.[11]  (R. at 400.)  Dr. Ehtesham prescribed Effexor and Vistaril.  (R. at 400.)  On May 31, 2007, Hamilton reported that her depression and anxiety were not improving.  (R. at 398.)  Her affect was depressed, and her mood was anxious.  (R. at 398.)  Sensorium and memory were intact, thought content was unremarkable, thought processes were linear and judgment was normal.  (R. at 398.)  Dr. Ehtesham prescribed Wellbutrin and Klonopin, advised Hamilton to continue Effexor and increased her dosage of Vistaril.  (R. at 398.)  On June 15, 2007, Hamilton reported continuing depression and increased anxiety on Wellbutrin.  (R. at 397.)  She had a depressed affect and an anxious mood.  (R. at 397.)  Her sensorium and memory were intact, thought content was unremarkable, thought processes were linear and judgment was normal.  (R. at 397.)  Dr. Ehtesham adjusted Hamilton's medications.  (R. at 397.)

On July 2, 2007, Dr. Ehtesham completed an Assessment Of Ability To Do Work-Related Activities (Mental), finding that Hamilton had a fair ability to follow work rules, to deal with the public, to interact with supervisors and to maintain personal appearance.  (R. at 394-96.)  Dr. Ehtesham also found that Hamilton had a poor ability to relate to co-workers, to use judgment, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out complex, detailed and simple job instructions, to behave in

---

[11]A GAF score of 51 to 60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning. . . ."  DSM-IV at 32.

an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 394-95.) Dr. Ehtesham explained that these findings were based on Hamilton's severe depression, mood swings, crying spells, mind racing, impaired memory and concentration and panic attacks when faced with the public. (R. at 394-95.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in

the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hamilton argues that the ALJ's finding as to her residual functional capacity during the relevant time period is not supported by substantial evidence. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 5-8.)[12] In determining whether substantial evidence supports the Commissioner's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano* , 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record supports her findings. The ALJ in this case found that Hamilton had the residual functional capacity to perform light work limited by an occasional ability to perform postural activities, an inability to deal with the public and an inability to perform more than simple, noncomplex tasks. (R. at 19-23.) Based on my review of the record, I find that substantial evidence exists to support such a finding.

_____

[12]Although Hamilton testified at her hearing that she was basing her disability argument solely on her mental impairments and associated limitations, she argues in her brief that the ALJ's mental and physical residual functional capacity findings are erroneous.

Specifically, I find that substantial evidence supports the ALJ's physical residual functional capacity finding during the relevant time period. I note at the outset that the majority of the medical records submitted on appeal post-date the relevant time period for determining disability. I further note that there is nothing in these medical records to relate them back to the relevant time period. In particular, the consultative examinations performed by Dr. Blackwell, as well as the state agency's Physical Residual Functional Capacity Assessment, were dated in June and December 2006. The state agency's assessment specified that it was a "current evaluation," (R. at 230), and there is nothing in either of Dr. Blackwell's evaluations to suggest they were anything other than then-current evaluations of Hamilton's impairments and associated limitations. Hamilton also submitted treatment notes from Stone Mountain that post-date January 2006. (R. at 345-60.) However, these notes also do not contain anything to relate them back to the relevant time period.

The medical records that are germane to the court's disability determination show that Hamilton received treatment for hypertension, elevated blood glucose levels, diabetes mellitus type 2, bilateral knee pain, hyperlipidemia, GERD, arthritis, congestive heart failure and coronary artery disease. (R. at 177, 280, 286-94.) Her physical conditions, with the exception of her coronary artery disease, were consistently treated conservatively with various medications, and no treating source placed any restrictions on her physical abilities. Moreover, the record is replete with instances of Hamilton's noncompliance with medication regimens and treatment recommendations, including dieting, exercising and smoking cessation during the time period pertinent to the ALJ's disability determination. For instance, in February 2003, Hamilton reported not getting her medications refilled. (R. at 294.) After a discussion

with Dr. Bellamy, she agreed to take her medications as prescribed.  (R. at 294.)
Nonetheless, in May 2003, Dr. Bellamy reported that Hamilton had designed her own
diabetes medication regimen.  (R. at 292.)  In December 2003, Hamilton continued to
smoke a pack of cigarettes per day with no interest in quitting.  (R. at 286.)  In May
2004, Hamilton again reported medication noncompliance for two months.  (R. at
283.)  In September 2004, Hamilton continued to smoke a pack of cigarettes per day
with no interest in quitting.  (R. at 280.)  In September 2005, she reported taking no
medications.  (R. at 181.)  Finally, in January 2006, Hamilton admitted that she was
not exercising.  (R. at 274.)

Although Hamilton alleges that she could not afford medications due to losing
her Medicaid benefits when her daughter turned 19 in 2004, some of her
noncompliance pre-dates that loss.  Additionally, the court notes that it costs nothing
to diet and exercise, and Hamilton would have saved money by stopping smoking.
In any event, to the extent that she was noncompliant with her medications regimens
after losing her Medicaid benefits, she admitted that she never sought to obtain her
medications through drug clinics or drug assistance programs.  As the Commissioner
notes in his brief, despite Hamilton's allegations that she did not seek such assistance
because she could not get out in public, she had managed to obtain food stamps and
heating assistance during the same time.  (R. at 422-23.)  Additionally, she was able
to travel to Baltimore on multiple occasions, attend several medical appointments
despite her fear of going out in public and even attempt to return to work briefly in
2005.

Pursuant to 20 C.F.R. §§ 404.1530, 416.930, if a claimant's ability to work can

be restored through treatment, then such prescribed treatment must be followed unless the claimant has a good reason for failing to follow such treatment. The record reveals that when Hamilton did choose to be complaint, her medical condition improved. Specifically, after being hospitalized for four days for elevated blood sugar levels, those levels were much improved. (R. at 297.) In December 2002, Hamilton's diabetes was improving with Glucophage. (R. at 297.) However, by May 2003, her noncompliance prompted Dr. Bellamy to state that her blood sugar levels needed to be under better control. (R. at 292.) By August 2003, her blood sugar levels again improved with medication compliance. (R. at 289.) In December 2003, Hamilton had lost five pounds since her previous visit, her blood pressure was stable and her blood sugar levels were mostly below 150. (R. at 286.) When informed in December 2005 that her blood sugar levels needed to be under control before proceeding with bypass surgery, she was able to do this with treatment compliance, and she was cleared for surgery in January 2006. (R. at 211-12, 278.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

As noted above, during the relevant time period, Hamilton traveled to Baltimore, she briefly returned to work as a cashier, she got a dog and cared for it, she reported driving her son to and from work and she helped her elderly mother with household tasks. On a Function Report dated November 4, 2005, Hamilton reported, among other things, walking her dog twice daily, as well as feeding and bathing it, straightening the house and washing laundry weekly. (R. at 148-50.) She reported no difficulty with personal care, and she reported fixing simple meals on a daily basis. (R. at 149-50.) Finally, I note that the ALJ gave more weight to the opinions of Drs.

Blackwell and Surrusco, even though they post-date the relevant time period. In any event, it is highly improbable that a functional capacity assessment completed during the relevant time period would have been *more* restrictive. In fact, it is reasonable to assume that Hamilton's conditions, if anything, would have worsened over time. Thus, I find that the ALJ gave Hamilton the benefit of the doubt by according great weight to the opinions of Drs. Blackwell and Surrusco, which are consistent with the other substantial evidence of record.

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's physical residual functional capacity finding that, during the relevant time period, Hamilton could perform light work with occasional postural activities. Next, I will address the ALJ's mental residual functional capacity finding.

The ALJ found that Hamilton could perform only simple, noncomplex work that did not require working with the public. This finding also is supported by substantial evidence. As with the medical evidence pertaining to Hamilton's physical impairments, most of the evidence pertaining to her mental impairments post-dates the relevant time period, including the PRTF completed by the state agency psychologist, Lanthorn's evaluation and Dr. Ehtesham's evaluation. Moreover, there is nothing contained in these records that relates any findings contained therein to the relevant time period, with the exception of Lanthorn's isolated statement that Hamilton had a "very long-standing" history of problems with depression, anxiety and social withdrawal. (R. at 342.) However, there is nothing contained in Lanthorn's evaluation to relate the severity of his imposed limitations resulting from those impairments to the relevant time period. Lanthorn's statement that Hamilton has a "very long-

standing" history of depression, anxiety and social withdrawal is of no value when unaccompanied by an opinion as to the severity of the limitations resulting from such diagnoses during the relevant time period.

The record shows that, during the relevant time period, Hamilton was diagnosed with an anxiety disorder, depression and polysubstance abuse. (R. at 280, 286, 289, 292, 380, 384, 387.) Although she was prescribed various psychotropic medications in an effort to improve her symptoms, the record shows multiple instances of treatment noncompliance during the time period pertinent to the ALJ's disability determination. For example, in February 2003, Hamilton stated that she had not refilled her prescriptions. (R. at 294.) She also had not kept an appointment with a psychiatrist. (R. at 294.) When Hamilton was admitted to the psychiatric unit at Bon Secours in March 2004, she had not taken her Prozac for six weeks and had been using crack cocaine and heroin. (R. at 380-81.) In May 2004, Hamilton reported not having filled the prescription written for her upon discharge from Bon Secours, and she further noted not having taken any medication for two months. (R. at 283.) In September 2005, she reported taking no medication. (R. at 181.) As discussed above, Hamilton had a duty to abide by prescribed medical treatment. *See* 20 C.F.R. §§ 404.1530, 416.930 (2009).

Furthermore, the record shows improvement in Hamilton's mental symptoms when compliant with medications and other treatment recommendations. For example, in August 2003, Hamilton's affect was improved, and she reported doing better after seeing a psychiatrist who adjusted her medications. (R. at 289.) In December 2003, Hamilton continued to do well with continued psychiatric treatment, reporting that she

felt "a lot better" at that time. (R. at 286.) After decompensating in March 2004 while in Baltimore, Hamilton's mood and affect stabilized following psychiatric hospitalization, during which time she received appropriate medications. (R. at 382.) Upon discharge, she exhibited appropriate behavior, had no suicidal ideations and was future-oriented. (R. at 382.) In September 2004, after returning to Virginia and resuming her medication regimen, Hamilton denied suicidal ideation and reported keeping busy driving her son to and from work. (R. at 280.) Again, "[i]f an impairment can be reasonably controlled with medication or treatment, it is not disabling." *Gross*, 785 F.2d at 1166.

Finally, it is important to note that no treating source placed any limitations on Hamilton's work-related mental activities during the relevant time period. Hamilton briefly returned to work as a cashier in 2005, admittedly quitting solely due to physical difficulties. Hamilton's activities of daily living during the relevant time period, as noted above, also support the ALJ's mental residual functional capacity finding. Finally, the ALJ gave Hamilton's testimony regarding her difficulty working around others the benefit of the doubt by incorporating it into his residual functional capacity finding.

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's mental residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.      Substantial evidence exists to support the Commissioner's finding with regard to Hamilton's physical residual functional capacity during the relevant time period;

2.      Substantial evidence exists to support the Commissioner's finding with regard to Hamilton's mental residual functional capacity during the relevant time period; and

3.      Substantial evidence exists to support the Commissioner's finding that Hamilton was not disabled under the Act and was not entitled to DIB or SSI benefits during the relevant time period.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hamilton's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits during the relevant time period.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations

to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    April 27, 2010.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE